**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **DR. ALLEN J. ZARNOW** | § | |
| **vs.** | § | **NO.  7:01-CV-128-KA** |
| **CITY OF WICHITA FALLS, et al.** | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND**
**MEMORANDUM ORDER**

This is a §1983 civil rights case brought by a Wichita Falls, Texas, physician complaining of searches of his office, residence and lake house, the seizure of his property, and the loss and destruction of items of his personal property seized during the searches, denial of counsel, denial of proper medical care, and seeking compensatory damages for the loss/detention of his property and compensatory and punitive damages for his mental and emotional distress caused by the manner in which the allegedly wrongful searches and seizures were conducted.  Dr. Zarnow brings this case pursuant to 42 U.S.C. §§ 1983 and 1988 alleging that his Constitutional rights under the Second, Fourth, Fifth, Sixth and Fourteenth Amendments were egregiously violated by nine named  and eight unnamed officers of the Wichita Falls Police Department, North Central Texas Drug Task Force and by the City of Wichita Falls.

**STORY FACTS GLEANED FROM THE**
**PARTIES' PLEADINGS AND OTHER SUBMISSIONS**

The summary judgment evidence of the parties paints the following picture.  In late June or early July 1999 Dr. Allen Zarnow who for 15 years had practiced medicine as a partner in the Clinics of North Texas ("Clinic") went to Chicago on a vacation with his family.  He was scheduled to return in mid-July. On July 1, 1999 Dr. Zarnow's nurse, Deanna Kyle ("Kyle") entered Dr. Zarnow's office at the Clinic and noticed a piece of trim from the desk was loose.  She told her supervisor, Linda Bruno, about the loose board and Bruno sent a janitor to repair the desk.  The janitor removed the trim piece from the bottom of

the desk and observed "something underneath there." Kyle and the janitor called Bruno back to Dr. Zarnow's office and she instructed them to "pull it out." That is when they discovered a gun, a magazine and boxes of shells. Bruno relayed the information to the Clinics' president, Dr. Larry Lyford, who ordered Kyle to leave everything as it was and to get everything she needed to do her work out of Dr. Zarnow's office. The following week Dr. Lyford discussed the matter with James Resendez ("Resendez") who was the chief manager of the Clinic.

On July 13, 1999, approximately two weeks after the initial discovery, Resendez, in anticipation of a meeting with the Executive Committee that afternoon, re-entered Dr. Zarnow's office with Bruno and Kyle. Bruno unlocked Dr. Zarnow's desk and they discovered inside one of the desk drawers blasting caps, .50 caliber ammunition and fuse type materials. That afternoon the Executive Committee of the Clinic met and decided to seek legal advice from their attorney, Gene Douglass. Douglass volunteered to make unofficial contact with the Bureau of Alcohol, Tobacco and Firearms ("ATF"). Someone at ATF informed Douglass to contact the local fire department, which he did. In response to Douglass' contact, the Wichita Falls Fire Dept. ("Fire Dept.") dispatched firefighters Jon Reese, Allen Nicholson and Monty Allred to the Clinic and they arrived at 4:01 p.m. On the way, Reese made contact with Assistant Fire Chief Harold Lindsey informing Lindsey that they were going to the Clinic on a "report of explosives" at the Clinic. Upon their arrival, firefighters Reese, Nicholson and Allred were met by Kyle and Bruno who lead them to Dr. Zarnow's office. Allred waited in the hall and Lindsey arrived shortly thereafter, along with James Resendez.

Kyle explained to the firefighters about her discovery. Firefighter Reese looked under the desk and saw the gun originally found by Kyle. Speaking to Resendez' concern about the Clinic's no-gun policy, Lindsey informed Resendez that the Fire Dept. "had nothing to do with firearms; that would be a police matter." Resendez informed Lindsey that they "also found explosives" whereupon Lindsey and

Nicholson proceeded to Dr. Zarnow's desk where the suspected "explosives" were located. There they found several fuses with detonator caps crimped on them, which they described as "finger poppers" or "military simulators" or "little booby-traps." Lindsey informed Resendez that the items they found were "not an imminent hazard" and that they had two options: either to wait for Dr. Zarnow's return or call an "EOD" (Explosive Ordnance Disposal) unit out of Ft. Sill, Oklahoma, to remove the items from the building. Resendez indicated his desire for the materials to be removed from the building. Based upon that decision, Firefighter Reese telephoned his battalion chief to contact the EOD unit from Ft. Sill. The fire department dispatcher was contacted and requested to have a police response "for explosive materials."

Responding to the request, Police Officer Eddie Carlton ("Carlton") responded to the scene and met with Lindsey. Lindsey informed Carlton that the matter was a police matter because the Fire Dept. did not take possession of guns or explosives and that the Fire Dept. was turning the matter over to the Wichita Falls Police Department ("Police Dept.") Officer Carlton entered Dr. Zarnow's office where he found Nicholson kneeling behind Zarnow's desk. Nicholson pointed out to Carlton the items in Zarnow's desk. Carlton opined, based on his military experience, that the items were "dangerous." In the meantime, the Ft. Sill EOD was contacted by the Wichita Falls Fire Dept. at 4:14 p.m. Carlton was informed by Resendez that he had learned from Kyle earlier in the day that Dr. Zarnow "was a gun expert and salesman," that Zarnow had talked about purchasing a rocket launcher, and that Zarnow had some land in Oklahoma where he would go to launch rockets (or blow up stumps).

At 4:37 p.m. Police Sergeant Joe Snyder arrived at the Clinic and was briefed by Carlton. Carlton then attempted to contact representatives of ATF, contacting Special Agent Dave Burns of the FBI for assistance. Burns contacted ATF and advised Carlton that ATF agents were on their way to the scene. At approximately 5:00 p.m. Sergeant Snyder telephoned Police Sergeant Roger Kendall to inform him

that Snyder was with the Fire Dept. at the Clinic and they were on a "bomb call." Based upon what Snyder told him, Kendall dispatched some investigators to the scene. Some time later Police Major Gerald Todd, commander of the Support Services Unit of the Police Dept. as a supervisor of detectives and investigations and TACT officers, arrived on the scene and was briefed by Snyder. At 5:40 p.m., Kendall dispatched Detectives Collier and Dilbeck to the Clinic in reference to a "bomb threat." After briefing Collier and Dilbeck, Kendall dispatched Detective Kyle Collier to obtain a search warrant for Dr. Zarnow's home at 4500 Ridgemont, Wichita Falls, Texas. At about 5:55 p.m., Kendall dispatched Investigator Bobby Dilbeck to obtain a search warrant for a locked file cabinet in Dr. Zarnow's office. At approximately 6:30 p.m., tactical officers from the Police Dept. were dispatched to Dr. Zarnow's residence, surrounded the house, kept surveillance on it and awaited further instructions. At 8:00 p.m. Collier secured the issuance of a search warrant for Dr. Zarnow's home. At 8:01 p.m. Dilbeck secured the issuance of a search warrant for the locked cabinet in Dr. Zarnow's office.

During their surveillance they discovered Dr. Zarnow was at home from his vacation trip to Chicago and relayed that information to the CIS detectives at the police station. The CIS detectives made telephone contact with Dr. Zarnow and asked that he walk outside with his hands above his head. Dr. Zarnow complied, made contact with the officers outside his house, where he was frisked for weapons. Police Sergeant Huffer requested Dr. Zarnow step back into the house with him to avoid public view. Zarnow complied. Zarnow told the officer he had two loaded guns in the house and two locked gun safes. The officers made a visual search, secured the two loaded guns and made sure that the safes were locked. At that time the officers asked Dr. Zarnow to accompany them to the police station to identify items that were found in his office. Dr. Zarnow agreed and was transported in the patrol car to the police station. In the meantime, other tactical officers remained on the scene outside Dr. Zarnow's house.

While at the police station Dr. Zarnow was interrogated by Detective Dilbeck and ATF Agent Ann

Sellers. During the interrogation Dr. Zarnow informed them that he had all necessary paperwork (he held a firearm dealer's license) to possess and own all of the weapons and related items that the officers had found. ATF Agent Sellers informed Dr. Zarnow that she needed to inspect his "paperwork" and asked him to produce it. Dr. Zarnow informed them that the papers were locked up at his house. While at the police station Dr. Zarnow requested to be allowed to call his attorney, Bob Estrada. The nature, content and response to that request is disputed, but Dr. Zarnow did not then make contact with Mr. Estrada.

Detectives Dilbeck and ATF Agent Sellers took Dr. Zarnow back to his home where he consented to allow ATF Agent Sellers into his house for the purpose of inspecting his collection and his documents that allowed him to possess the firearms. When Dr. Zarnow and ATF Agent Sellers entered the house, Detective Dilbeck, together with several other officers, followed them into the house. While ATF Agent Sellers inspected the paperwork, Detective Dilbeck and the other police officers began an inspection of the house looking into each room. ATF Agent Sellers reviewed Dr. Zarnow's paperwork, comparing the paperwork to the items of firearms and ammunition as they were discovered by the officer. The officers discovered some boxes marked "explosives" "in plain view" in Dr. Zarnow's game room. Thereupon Dr. Zarnow asked the officers to discontinue their search and leave the home. At that point Detective Dilbeck informed Dr. Zarnow that they no longer needed his consent to search because they had a search warrant and the officers continued the search.

Both the search warrant for Dr. Zarnow's house and the search warrant for a cabinet at Dr. Zarnow's office had been issued by the local Municipal Judge at approximately 8:00 p.m. Dr. Zarnow got to a phone and called his attorney, Bob Estrada, at his office and left a recorded message for his lawyer to call him. The officers ordered Dr. Zarnow to sit on his couch while they continued their search. Attorney Bob Estrada telephoned Dr. Zarnow's home on more than one occasion but was not allowed by the WF police officers to speak to Dr. Zarnow. After the search was concluded at midnight, Dr. Zarnow

was again taken to the police station and questioned without the presence of his attorney.

The next morning Police Chief Ken Coughlin assembled all of the firearms and ammunition seized at Zarnow's home, laid them in an array before the television and print news media. The assembled pictures of the array ran on the local news channels that evening and the next day. That day, July 14, Police Detective Dennis Keethler signed an affidavit for the arrest of Dr. Zarnow alleging that he was in possession of prohibited weapons. Dr. Zarnow was jailed for possession of prohibited weapons and bond was set at $500,000.00. In the afternoon of July 14, 1999, Dr. Zarnow's attorney Bob Estrada commenced negotiations for reduction of the bail. On July 14, 1999, North Texas Narcotics Task Officer Rick Espinoza signed a probable cause affidavit for a search warrant of Dr. Zarnow's lake house. Dr. Zarnow furnished the officers his keys to the lake house to avoid damage from a break in. On July 16, 1999, Officers of the WF police department executed an additional search warrant at Dr. Zarnow's home and lake house and seized various medicines/drugs from various locations in the home and lake house. Dr. Zarnow was subsequently no billed by the Wichita County Grand Jury and the Montague County prosecutor declined to bring any charges against Dr. Zarnow with regard to items at his lake house.

As a result of the searches of Dr. Zarnow's office, house and lake house, the Police Dept. seized 4,000 plus rounds of assorted ammunition, ammunition magazines, holsters, speed loaders, revolvers, switchblade knife, currency, bonds, silver, shotguns, rifles, flare launcher, M-60 machine gun, 0.9 mm Uzi, spotter scope, 4 silencers, a stun gun, a total of 148 items, exclusive of the ammunition. In order to secure his pre-trial release, Dr. Zarnow, through his attorney, negotiated with the District Attorney for an agreement under which the ammunition would be destroyed and his bail reduced. After Dr. Zarnow was no-billed by the grand jury, he demanded return of the seized items, most of which were returned, but many are lost or unaccounted for. For the loss and destruction of the ammunition and the loss or destruction of the unreturned items, Dr. Zarnow seeks monetary compensation. He seeks compensatory

damages for health related damages and punitive damages.

## MOTIONS PENDING AS TO PARTIES REMAINING

In his original complaint, Dr. Zarnow sued the City of Wichita Falls, nine named law enforcement officers, eight unnamed law enforcement officers and the Chief of Police.  Each individually named defendant was sued in his individual capacity and in his capacity as an agent, servant and employee of the Wichita Falls Police Department and of the City of Wichita Falls, Texas.  John Doe Defendants Nos. 1-4 were sued in their individual capacities and as agents, servants and employees of the Wichita Falls Police Department and of the City of Wichita Falls, Texas.  John Doe Defendants Nos. 5-8 were sued as full-time police officers employed by the North Central Texas Narcotics Task Force and the City of Wichita Falls, Texas.  By Order entered March 10, 2003, Plaintiff took a non-suit as to named Defendant Kissinger.  After numerous extensions of the Scheduling Orders, on August 24, 2004 the parties consented to trial before the Magistrate Judge and on September 3, 2004, an Order was entered re-assigning the case to me.  On February 25, 2005, Plaintiff took non-suit as to named Defendant Rick Espinoza.  By Order dated September 22, 2005, November 28, 2005 was established as the deadline for the filing of dispositive motions.  On November 28, 2005, the parties filed the following motions:

1.    Plaintiff's Motion for Summary Judgment

2.    Defendant City of Wichita Falls' Motion for Judgment on the Pleadings (Rule 12(c))

3.    Defendant City of Wichita Falls' Motion for Summary Judgment

4.    Individual Defendants' Motions for Judgment on the Pleadings (Rule 12(c))

5.    Individual Defendants' Motions for Summary Judgment.

The following day Plaintiff filed his "Corrected" Motion for Summary Judgment and the parties filed their respective appendices.  Time limits for responses and replies were extended by Order entered December 5, 2005.  Objections, Responses and Replies were subsequently filed.  Objections and Motions

to Strike their opponents' summary judgement proofs were considered by the Court and essentially denied by orders. Under the Scheduling Order the times for addition of parties and for pleading as to individual parties have closed. There being no allegations against Defendants John Does 1 through 4 or Defendants 5 through 8, Plaintiff's causes of action, if any, against said defendants are hereby **DISMISSED**. This leaves as the remaining defendants the City of Wichita Falls, Chief Ken Coughlin, Major Todd, Lieutenant Jay Cummings, Sergeant Roger Kendall, Officer Bobby Dilbeck, Officer Dennis Keethler, and Officer Bill Pursley.

## SURVIVORSHIP

On January 28, 2006, while the foregoing Motions were under the Court's consideration, Plaintiff, Allen J. Zarnow died. Neither Plaintiff nor Defendants have yet filed a suggestion of death and no family member or executor, administrator, heir or other representative has yet entered an appearance. Survivability of causes of action for violation of civil rights and/or Constitutional rights have been addressed by the U.S. Supreme Court in *Roberson v. Wegmann*, 98 S.Ct. 1991, 436 U.S. 584, 56 L.Ed.2d (1978) holding that since there is no federal survivorship statute, under the aegis of the provisions of 42 USC 1988, state survivorship statutes could be looked to to determine the survivability of a cause of action and any limitations with regard thereto. In subsequent cases distinctions have been made between wrongful death causes of action founded upon Constitutional violations and the survivability of personal injury causes of action. *Brazier v. Cherry*, 293 F.2d 401 where the Court applied Georgia statutes which "prescribe separate and distinct causes of action.... One is for survival of the decedent's cause of action; the other for injury inflicted upon the survivor." Ibid., p. 407. Similarly, Texas has two survivorship statutes: one addressing wrongful death actions (§71.002 Texas Civil Practice and Remedies Code) and survival of personal injury actions (§71.021 Texas Civil Practice and Remedies Code). Nowhere has Plaintiff in this case claimed that any of the alleged violations caused the Plaintiff's death. §71.021

provides as follows:

> § 71.021. Survival of Cause of Action
>
> (a) A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.
>
> (b) A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person. The action survives against the liable person and the person's legal representatives.
>
> (c) The suit may be instituted and prosecuted as if the liable person were alive.

As to survivability of the Plaintiff's causes of action, the Court examines the nature of relief sought by the Plaintiff as set forth in the Plaintiff's Amended Complaint. Those damages and injuries for which compensation is sought were as follows:

    a.    medical expenses in the past and future
    b.    loss of employment, income, benefits, in the past and future
    c.    physical pain and mental anguish
    d.    property damage and loss.

Plaintiff further sought punitive damages, interest and attorney's fees. The nature of the damages and injuries for which Plaintiff sought recovery, to-wit: medical expenses, loss of income, physical pain and mental anguish, are of the same nature as causes of action for personal injuries within the scope of (a) of §71.021 of Texas Civil Practice and Remedies Code and hence survive Plaintiff's death. With regard to the property damage claim, in *Landers v. B.F. Goodrich Company*, 369 S.W.2d 33 (Tex. 1993), the Supreme Court determined that the administrator of a deceased plaintiff could pursue an action to recover medical and funeral expenses expended on behalf of the decedent and to pursue a cause of action for recovery of damages for damage to decedent's automobile. In that suit the Texas Supreme Court recognized the distinction between the cause of action for damages sustained by the decedent and his estate as a result of injuries and the cause of action for wrongful death on behalf of decedent's survivors. Therefore, I conclude that Plaintiff's cause of action for damage and/or destruction of his property

likewise survived his death. *See also Goode v. Shoukfeh*, 863 S.W.2d 547, 551 (Tex.App.-Amarillo, 1993, no writ). That case recognizes the distinction between the wrongful death cause of action and the survival of a cause of action for personal injuries.

The U.S. Supreme Court has recognized punitive damages as a proper element of recovery in a §1983 action. Texas courts have held that punitive or exemplary damages survive the death of the owner. Following the lead of the Supreme Court of Texas in *Landers*, the Court of Appeals in El Paso decided in *Pace v. McEwen*, 574 S.W.2d 792 (Tex.App.-El Paso, 1978) held that "exemplary damages do survive.... Since the basis of exemplary damages is to furnish a needed deterrent to wrong doing, the deterrent should survive the death of the injured parties in areas where the Constitution and statutes have not provided to the contrary." I conclude that Plaintiff's alleged cause of action for punitive damages has survived his death.

## SIMULTANEOUS FILING

As indicated above, Defendants simultaneously filed their Motions to Dismiss to challenged the sufficiency of Plaintiff's pleadings and the Motions for Summary Judgment to challenge the sufficiency of Plaintiff's evidence. The Motions to Dismiss challenge the sufficiency of the Plaintiff's pleadings. The City's Motion challenges the Plaintiff's pleadings with regard to a violation of the Second, Fifth, Sixth and Fourteenth Amendments. The Officers' Rule 12(c) Motion challenges the sufficiency of Plaintiff's pleadings (1) to state a claim under the Second Amendment, (2) to state any cause of action requiring a showing of deliberate indifference, (3) to allege proper elements of a claim under the Fourteenth Amendment with regard to the rights of pre-trial detainees requiring medical care, (4) in alleging intentional infliction of emotional distress fails to follow the law, (5) to state claims under the Fifth Amendment, (6) to state claims under the Sixth Amendment, (7) to state claims under the Fourteenth Amendment, and (8) to state claims under the Texas Constitution. Finally, the Officers' Rule 12(c)

Motion asserts that Plaintiff has wholly failed to plead facts sufficient to overcome the individual officers' qualified immunity defense.

The Officers' Motions attack the sufficiency of pleadings. This case has proceeded through discovery prior to the filing of the Rule 12(c) Motions which were filed at the same time as the Motions for Summary Judgement and Responses. While the salutary purpose for early consideration of the 12(c) Motions with regard to qualified immunity has largely been lost due to the filing of the Motions so late in the litigation process, Plaintiff's objection that the Motions have been waived is overruled. I conclude that I should consider the substance of the City's and Officers' 12(c) Motions as part of their respective Motions for Summary Judgment and should consider the materials submitted in support of the Motions for Summary Judgment in considering whether causes of action have been stated under each of the Plaintiff's theories and whether the officers have qualified immunity as to such causes of action.

## TEXAS WEAPONS STATUTES

I begin an analysis with a review of the Texas Weapons statutes since their claimed violation by was the motivating factor behind the searches and seizures.

Firearms and explosives are not *per se* illegal. Possession of guns or firearms is not *per se* illegal. However, guns and explosives scare people because of their capacity to cause bodily injury and death. Because of that capacity, the law restricts possession of guns and explosives in numerous ways. There are restrictions on persons who may possess guns or explosives; there are restrictions on places where guns or explosives may be possessed; and there are prohibitions with regard to the manner in which guns or explosives may be possessed. The state of Texas has such restrictions.

The Texas statutory prohibitions with respect to firearms and explosives are contained in Chapter 46 of the Texas Penal Code, which starts out in Sec. 46.01 with a series of definitions covering all manner of weapons, including firearms, explosive weapons, hand guns, machine guns, silencers and switchblade

knives. Sec. 46.04 proscribes conditions under which certain persons are precluded from possessing a firearm, to-wit: a felon, a person convicted of an offense of family violence and a person who is subject to a family relations order. Sec. 46.06 proscribes certain prohibited transfers of certain weapons. Sec. 46.09 proscribes knowing possession of components of an "explosive weapon with an intent to combine the components into an explosive weapon for use in a criminal endeavor." Sec. 46.11 proscribes possession of weapons within the proximity of schools or certain school activities. Sec. 46.13 proscribes allowing children to have access to firearms. Sec. 46.03 proscribes places where weapons may not be possessed, such as schools, polling places, governmental offices, race tracks, airports, prisons. None of these preceding sections, except the definitions section, are implicated in this case. Rather, it is Sec. 46.05 that proscribes intentional or knowing possession of certain kinds of weapons, to-wit: "(1) an explosive weapon, (2) a machine gun, (3) a short-barrel firearm, (4) a firearm silencer, (5) a switchblade... (7) armor piercing ammunition, (8) a chemical dispersing device or (9)...." This section, however, expressly states in subpart (c) "It is a defense to prosecution under this Section that the actor's possession was pursuant to registration pursuant to the National Firearms Act, as amended."

Section 46.05 of the Texas Penal Code provides, in pertinent part, as follows:

*"(a) A person commits an offense if he intentionally or knowingly possess... (1) an explosive weapon, (2) a machine gun, (3)..., (4)a firearms silencer, (5) a switchblade knife, (6)..., (7) armor piercing ammunition;*

*"(b)...*

*"(c) It is a defense to prosecution under this Section that the actor's possession was pursuant to registration pursuant to the National Firearms Act [26 USCA § 5801 et seq], as amended."*

Section 46.01 of the Texas Penal Code defines explosive weapons and firearms as follows:

*(2) "explosive weapon" means any explosive or incendiary bomb, grenade, rocket, or mine, that is designed, made, or adapted for the purpose of inflicting serious bodily injury, death, or substantial property damage, or for the principal purpose of causing such a loud report as to cause undue public alarm or terror, and includes a device designed made or adopted for delivery or shooting an explosive weapon.*

*(3) "Firearm" means any device designed, made or adopted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use. Firearm does not include a firearm that may have, as an integral part, a folding knife blade or other characteristics of weapons made illegal by this chapter that is....."*

Section 46.09 of the Texas Penal Code addresses components of explosives and proscribes as follows:

*(a) A person commits an offense if the person knowingly possesses components of an explosive weapon <u>with the intent to combine the components into an explosive weapon for use in a criminal endeavor</u>.*   [emphasis added]

Although there are also federal prohibitions and restrictions with regard to firearms and explosives, the officers making the searches and submitting the affidavits for the search warrants did not allude to such federal prohibitions. Therefore, I conclude that they were not elements of the probable cause determinations by the officers.

### SEARCHES - TIMES AND PLACES

This case involves nine separate searches: four searches at Dr. Zarnow's office, four searches at Dr. Zarnow's residence, and one search at Dr. Zarnow's lake house. The four searches at Dr. Zarnow's office were:

1. initial search and discovery by personnel of the Clinic
2. search by members of the Fire Dept.
3. search by Sgt. Mills of Ft. Sill EOD unit
4. search conducted after issuance of the office search warrant.

The four searches of Dr. Zarnow's house were:

1. an original entry and search by TAC T officers and police detectives, with Dr. Zarnow's consent late on the night of July 13.
2. a consensual search after Dr. Zarnow's return from interrogation at the Police Station
3. a search under the house search warrant after Dr. Zarnow had revoked his consent
4. a subsequent search of the house on July 16 pursuant to a warrant.

The search of Dr. Zarnow's lake house was:

1. search pursuant to search warrant on July 16.

Plaintiff challenges all of the searches and the subsequent seizures as being unreasonable under the Fourth Amendment since the officers, individually and collectively, lacked probable cause for the warrantless searches, there was no probable cause for the issuance of the warrants, and subsequent discoveries eliminated probable cause for any of the seizures, and seizures were not justified under the "plain view" doctrine as articulated by the Chief of Police, the City's prime policy maker, with regard to the written search policy of the City's Police Dept. which allowed officers to seize anything in sight whether or not they had formed any reasonable belief that the items were connected in any way to a crime.

## ARTICLE IV ANALYSIS
## PLAINTIFF'S POSITION - HOUSE SEARCH

The Summary Judgment record reflects that the home search warrant was issued at 8:00 p.m. on July 13, 1999.[1] Plaintiff asserts, both in support of his Motion for Summary Judgment and in Opposition

---

[1]   "The undersigned Affiant, being a Peace Officer under the laws of the State of Texas and being duly sworn, on oath makes the following statement and accusations:

"1. There is in Wichita County, Texas a suspected place and premises described and located as follows: THAT RESIDENT ALLEN ZARNOW OF 4500 RIDGEMONT IS IN POSSESSION OF EXPLOSIVES AND OTHER EXPLOSIVE DEVICES AT SAID RESIDENCE. THE RESIDENCE IS A SINGLE FAMILY DWELLING WITH MULTI COLORED BRICK. THE RESIDENCE ON THE EASTSIDE OF THE STREET FACING WEST. THE RESIDENCE HAS A TWO CAR ATTACHED GARAGE ON THE SOUTHEAST CORNER. THE RESIDENCE HAS A GLASS FRONT DOOR WITH THE NUMBER'S 4500 AFFIXED ABOVE THE FRONT DOOR. THE RESIDENCE HAS A SIX FOOT PRIVACY FENCE AND BLACK ASBESTOS SHINGLES. THERE IS ALSO A 1990 BLUE JEEP CHEROKEE BEARING TEXAS LICENSE PLATE THJ-O8B PARKED IN THE FRONT DRIVEWAY. THE VEHICLE IS REGISTERED TO ALLEN ZARNOW OF 4500 RIDGEMONT.

"2. Said suspected place and premises are in charge of and controlled by each of the following persons: ALLEN ZARNOW D.O.B. 03-07-52, DELORES ZARNOW 05-14-5__

"3. It is the belief of the Affiant that a specific criminal offense has been committed, and he hereby charges and accuses that: RESIDENT ALLEN ZARNOW IS IN POSSESSION OF ILLEGAL EXPLOSIVES AND OTHER EXPLOSIVE DEVICES IN VIOLATION OF TEXAS PENAL CODE STATUTE 46.05 PROHIBITED WEAPONS AND TEXAS PENAL CODE STATUTE 46.09 COMPONENTS OF EXPLOSIVES.

"4. There is at said suspected place and premises, property and items concealed and kept, constituting evidence of said offense and constituting evidence that a particular person committed said offense, described as follows: VARIOUS TYPE OF EXPLOSIVES, ASSORTED EXPLOSIVE TRIGGERING DEVICES, ANY PROHIBITED WEAPONS, WRITTEN RECORDS, BOOKS, NOTES AND DOCUMENTS INDICATING THE SALES OF, PURCHASES, AND/OR TRANSACTIONS OF EXPLOSIVE DEVICES. ANY PAPERS OR DOCUMENTS INDICATING THE TRANSPORTARTION OF AND/OR PURCHASE OF PROHIBITED WEAPONS. WRITTEN DOCUMENTS INDICATING POSSESSION OF AND/OR DOMINION AND CONTROL OF THE HERE AND AFTER DESCRIBED PREMISES, SUCH AS UTILITY BUILDINGS, RECEIPTS, MAIL ETC. WRITTEN DOCUMENTS INDICATING POSSESSION OF OR OWNERSHIP OF ANY OTHER PROPERTIES. COMPUTERS AND ANY AND ALL CONTENTS INCLUDING ALL FILES. ANY PAPERS OR DOCUMENTS INDICATING THE LEASE OF STORAGE FACILITIES OF ANY TYPE.

"5. Affiant has probable cause for said belief by reason of the following facts: AT 1601 HOURS OF 07-13-99 THE WICHITA FALLS FIRE DEPARTMENT WAS SENT TO 1518 10TH STREET IN REFERENCE TO A BOMB THREAT. FIRE OFFICIALS QUICKLY NOTIFIE POLICE PERSONNEL ABOUT THE EXISTENCE OF EXPLOSIVES INSIDE THE BUILDING. THE F.B.I. WAS ALSO NOTIFIED AT THAT TIME. THE EXPLOSIVES WERE FOUND INSIDE DR. ALLEN ZARNOW'S OFFICE. THERE WERE SEVERAL EXPLOSIVES FOUND IN THE OFFICE AREA AS WELL AS OTHER EXPLOSIVE DEVICES. THE BUILDING WAS EVACUATED AT THAT TIME. OFFICERS WERE SENT TO WATCH ZARNOW'S RESIDENCE AT 4500 RIDGEMONT. OFFICERS STATED THE HOUSE APPEARED TO LOOK AS IF THERE WAS NO ONE HOME. THE BLINDS WERE DRAWN AND PAPERS WERE LAYING OUTSIDE. DR. ZARNOW'S WHEREABOUTS IS UNKNOWN AT THIS TIME. IT IS UNKNOWN TO OFFICERS WHY THE EXPLOSIVES ARE IN DR. ZARNOW'S OFFICE AND OFFICERS FEEL MORE EXPLOSIVES COULD BE INSIDE ZARNOW'S RESIDENCE. IT IS UNKNOWN TO OFFICERS AT THIS TIME IF ZARNOW IS SOME TYPE OF SURVIVALIST OR WHAT. OFFICERS FEEL THE NEED TO CHECK THE RESIDENCE FOR THE SAFETY AND WELFARE OF THE SURROUNDING NEIGHBORS. IT IS ALSO REQUESTED THAT THE VEHICLE PARKED IN THE DRIVEWAY BE INCLUDED IN THE SEARCH AS WELL AS ANY OTHER PROPERTY OR ITEMS ATTACHED WITH THE RESIDENCE. IT IS REQUESTED THIS WARRANT BE

to Defendant Officers' Motion for Summary Judgment, that at the time the warrant was issued the only items found in Dr. Zarnow's office that might potentially have been within the definitions of "explosive weapon" or "component of explosives" were ten civilian electric blasting caps ("blasting caps"), thirty each 36" long pieces of civilian time fuse ("fuse") with non-electric blasting caps crimped to one end, four civilian time fuse igniters ("igniters") and a cardboard tube 3.5" in diameter and 6" long.[2]  Plaintiff opines that:

(1)  blasting caps and fuses are neither prohibited weapons nor explosive weapons since they do not fall within the statutory definition of "explosive weapons" under § 46.01(b);

(2)  Not being prohibited weapons, their possession by Dr. Zarnow could not have been wrongful;

(3)  Since they were not possessed by a prohibited person or in a statutorily prohibited place, no crime was implicated by the mere possession;

(4)  any further search without a warrant was not based on probable cause;

(5)  The subsequent searches by officers of the Police Dept. and later by the Fort Sill EOD officers, were Constitutionally infirm since they lacked probable cause;

(6)  Any subsequently discovered explosive materials (kinestix explosive), etc. "not in plain view" could not support the probable cause finding in the search warrant for the house;

(7)  The home search warrant affidavit was based on erroneous information and hyperbole of the affiant and/or the officers who relayed information to the affiant; and

(8)  By the time the house search warrant was relied upon (after Dr. Zarnow's revoked search permission) the probable cause support through the warrant had been destroyed by Zarnow's production of his firearms dealer's license and other documents supporting his right to possession.

## THE SEARCHES

---

A NO KNOCK WARRANT.  LET IT ALSO BE NOTED THAT THIS RESIDENCE IS SUPPOSED TO BE BOOBY TRAPPED ACCORDING TO AN EMPLOYEE THAT WORKS WITH DR. ZARNOW AND ZARNOW HAS TOLD EMPLOYEES THAT HE IS IN POSSESSION OF A ROCKET LAUNCHER.  THE FIREMAN AT THE SCENE THAT IDENTIFIED THE DANGEROUS EXPLOSIVES IS A FORMER MILITARY BOMB HANDLER AND AN EXPERT ON BOMBS AND EXPLOSIVES. HIS NAME IS ALAN NICHOLSON AND HAD FI__ YEARS EXPERIENCE AS A BOMB HANDLER IN THE MILITARY.  BASED ON HIS EXPERIENCE IN THE MILITARY, HE IS FAMILIAR WITH VARIOUS TYPES OF EXPLOSIVE DEVICES.  HE POSITIVELY IDENTIFIED THE DEVICES INSIDE THE OFFICE BUILDING AS EXPLOSIVES. __ IS ALSO KNOWN TO BE IN POSSESSION OF VARIOUS GUNS AND AMMUNITION AT HIS RESIDENCE AND HAS HIS GUN SAFE BOOBY TRAPPED WITH TEAR GAS IF SOMEONE ATTEMPTS TO ENTER.
"WHEREFORE, your Affiant asks for the issuance of a warrant that will authorize him to search said suspected place and premises for said property and seize the same.

/s/ Kyle Collier WFPD #527"

[2]  These items were variously described by different persons using somewhat varied descriptions.  This description of the items was from the Affidavit of Sgt. Mills, the EOD officer from Ft. Sill whose job function appears to me to give his description of the items the most credence.

I find that the first search at Dr. Zarnow's office was originally initiated by the staff of the Clinic up until the Fire Dept. was called in and thereafter until the first police officer arrived on the scene. Items of materials discovered during that first search were a hand gun, some ammunition, blasting caps, fuse and igniters. The hand gun and ammunition were not "prohibited weapons" under §46.05, Dr. Zarnow was not a prohibited person under §46.04. Although possession of the hand gun and ammunition may have violated the Clinic's personnel policies, they were not possessed at a prohibited place under § 46.03 or §46.11.

Searches by private parties such as the Clinic personnel and revelation of the kind and character of items described in such search does not vitiate the use of such information by law enforcement officers in determining if probable cause exists for subsequent warrantless searches or for support for issuance of a search warrant.[3]

Plaintiff contends that the follow-up search of Dr. Zarnow's office by representatives of the Police Dept. without a warrant depends upon a determination of whether or not there was probable cause to believe that the blasting caps, fuse and igniters, alone or in combination, constituted an "explosive weapon" as defined in Sec. 46.01(2) and that the officers conducting the search were unreasonable in their conclusion or opinion to such effect.

Issues of probable cause determine the reasonableness *vel non* of all of the searches and the subsequent seizures. Whether probable cause existed for each search depended upon what the officers knew or reasonably believed at the time the searches were conducted. The same is true whether the search was warrantless or made with a warrant. With regard to warrantless searches, probable cause is tested by the knowledge that the searcher had at the time of the commencement of the search. Knowledge acquired by the searcher during the course of the search may justify altering the objects and ambit of the search and may even vitiate continuation of the search once started but cannot validate a search commenced without probable cause. *Maryland v. Garrison*, 480 U.S. 79, 94 L.Ed.2d 72, 107 S.Ct. 1013 (1987). With respect to searches pursuant to a warrant, the Fourth Amendment demands "No Warrants shall issue, but upon probable cause, supported by Oath or affirmation." However, when the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a "truthful" showing. It is necessary to be "truthful" that the information put forth is believed or appropriately accepted by the affiant as true. If a warrant affidavit is subsequently revealed

---

[3] *U.S. v. Jacobson*, 466 U.S. 109, 80 L.Ed.2d 85, 104 S.Ct. 1652 (1983)

Page 16

to contain a deliberate or recklessly false statement, probable cause is vitiated. *Franks v. Delaware*, 438 U.S. 154, 164-65, 57 L.Ed.2d 667, 98 S.Ct. 2674 (1978). The same rule obtains with regard to false swearing of an affidavit in support of an arrest warrant. *Malley v. Briggs*, 475 U.S. 335, 89 L.Ed.2d 271, 106 S.Ct. 1092 (1985). Furthermore, the issue is not the officer's subjective good faith but rather the Court's inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal (i.e., without probable causes) despite the Magistrate's authorization." *Malley*, supra. at 345. Accordingly, a police officer may be held liable in his individual capacity for filing an application for a search warrant without probable cause just as the Supreme Court held with regard to an arrest warrant in *Malley* wherein the Court stated

> *if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if the officers of reasonable competence could disagree on this issue, immunity should be recognized.... Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable... will the shield of immunity be lost.... [The question] is whether a reasonably well-trained officer's [the defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. Malley, at pp. 341, 344*

It is undisputed that officers may submit warrant applications containing hearsay, including, of course, information provided by other officers. *Bennett v. City of Grand Prairie*, 883 F.2d 400 (5th Cir., 1989) citing *Franks* at 98 S.Ct. 2681. The Supreme Court has stated "reasonable minds frequently may differ on the question of whether a particular affidavit establishes probable cause, and (we) have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determinations." *U.S. v. Leon*, 468 U.S. 897, 82 L.Ed.2d 677, 104 S.Ct. 3405 (___), citing *Spinelli v. U.S.*, 393 U.S. at 419, 21 L.Ed.2d 637, 89 S.Ct. 584 (1969); *St. Louis v. Gates*, 462 U.S. at 236, 76 L.Ed.2d 527, 103 S.Ct. 2317 (1969); *U.S. v. Ventresca*, 380 U.S. 102, 13 L.Ed.2d 684, 85 S.Ct. 741 (1965). Deference to the magistrate's determination, however, is not boundless. It is clear that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit upon which the determination was based. *Leon* at p. 914 citing *Franks*. Reviewing courts will not defer to a warrant based on an affidavit that does not "provide the

Page 17

magistrate with a substantial basis for determining the existence of probable cause." _Leon_ at p. 915 citing _Illinois v. Gates_. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." _Leon_ at p. 915.

Whether executing a seizure of materials in "plain view" (_Texas v. Brown_)[4] or preparing and executing an affidavit in support of a search warrant (_Franks v. Delaware_) or submitting an affidavit for an arrest warrant (_Malley v. Briggs_) or arresting a defendant pursuant to a warrant (_Bennett v. City of Grand Prairie_), an officer must, in good faith, believe that the information before him or appropriately accepted by him is true. Whether the information comes directly to the officer by observation or personal interview or from another officer, he must first believe that it is true. Secondly, where the information is so lacking in indicia of probable cause as to render official belief in existence unreasonable, the officer steps across the Constitutional line. The question then is whether a reasonably well trained officer, in the Defendants' position, would have known that his information received and/or communicated failed to establish probable cause and that he should not have seized the evidence or should not have applied for the search warrant. _Malley v. Briggs_, supra.

In _Franks_ the Supreme Court confirmed that under the Fourth and Fourteenth Amendments

> *a challenge to a warrant's veracity must be permitted, saying "we derive our ground from language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise: '[N]o warrants shall issue, but upon probable cause, supported by Oath or Affirmation.... [W]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a truthful showing.... This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily, but surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted*

---

[4]   460 U.S. 730, 75 L.Ed.2d 502, 103 S.Ct. 1535 (1983)

*by the affiant as true.*[5]

What is missing in each of the warrantless searches and in the search warrants are any allegations of, statements with respect to, or other justifications for, an assumption that Dr. Zarnow possessed any of the items discovered or to be discovered "with the intent to combine the components into an explosive weapon for use in a criminal endeavor" or possessed the items "illegally," i.e., under conditions sufficient to deem the items "prohibited weapons." Possession with an intent to possess is not a crime under Texas or federal law, whether the object possessed is a firearm, weapon or explosive component.

## HOME SEARCH WARRANT - OFFICER KENDALL

While a reasonably trained responsible law enforcement officer in the exercise of professional judgment might reasonably conclude that blasting caps in close association with fuses and igniters might constitute <u>components</u> of explosives, I question that that officer in the exercise of reasonable judgment could conclude that they constituted "explosives" or "explosive weapons." I conclude that no reasonably trained officer in the exercise of reasonable professional judgment could conclude from the rumor or innuendo circulating at the Clinic that Dr. Zarnow possessed the items "with the intent to combine the components into an explosive weapon for use in a criminal endeavor." Officer Collier who signed the affidavit for the house search warrant had minimal involvement in the investigation itself, but relied upon statements made to him by Detective Kendall. Collier may have reasonably believed Detective Kendall that the materials were "explosives," but Kendall could not have reasonably believed from the information he had and communications he had received when he instructed Collier to secure the house search warrant that Dr. Zarnow, the possessor of the blasting caps, fuse and igniters, possessed them "with the intent to combine the components into an explosive weapon for use in a criminal endeavor."

---

[5] *Franks* at 164-165. Although *Franks* addressed the Constitutional issue in the context of applying the exclusionary rule, it is nonetheless applicable in testing the Constitutionality of warrantless searches, searches with warrants, arrests pursuant to warrants and seizures pursuant to searches or in plain view.

If Kendall had such a belief, it appears it was based solely upon unsubstantiated rumor, unsubstantiated speculation, and innuendo. It appears that Kendall's communications to Collier forming the basis of the affidavit for the house search warrant resulted in a hyperbolic stretching of the truth either by Kendall or by Collier. Whether Kendall stretched the truth in his communications to Collier or Collier engaged in hyperbole in his affidavit recitations is unclear from the summary judgment proof. Officer Collier is not a named Defendant. Detective Kendall is not entitled to qualified immunity since Plaintiff has alleged and articulated facts sufficient to overcome the presumptive of reasonableness of his actions.

## OFFICE SEARCH WARRANT - OFFICER DILBECK

With respect to the office search warrant, Dilbeck relied upon information supplied to him by Kendall which, by 8:00 p.m. when it was issued, included information concerning the search made by the Ft. Sill EOD unit and by Keethler from his interview with Nurse Kyle.[6] Although the office search warrant affidavit references the explosive devices and does recite that the devices had been deemed

---

[6] "THE STATE OF TEXAS   AFFIDAVIT FOR EVIDENTIARY SEARCH WARRANT  COUNTY OF WICHITA

"The undersigned Affiant, being a Peace Officer under the laws of the State of Texas and being duly sworn, on oath makes the following statement and accusations:

"1. There is in Wichita County, Texas a suspected place and premises described and located as follows:  DR ALLEN ZARNOW'S OFFICE LOCATED AT THE CLINICS OF NORTH TEXAS OFFICE AT 1518 10TH STREET IN WICHITA FALLS, TEXAS.

"2.      Said suspected place and premises are in charge of and controlled by each of the following persons: ALLEN J. ZARNOW, W/M, DOB 030752.

"3.      It is the belief of the Affiant that a specific criminal offense has been committed, and he hereby charges and accuses that: ALLEN ZARNOW IS UNLAWFULLY IN POSSESSION OF PROHIBITED WEAPONS, TO WIT, EXPLOSIVE DEVICES, AT HIS BUSINESS OFFICE LOCATED AT 1518 10TH STREET IN WICHITA FALLS, TEXAS.

"4.      There is at said suspected place and premises, property and items concealed and kept, constituting evidence of said offense and constituting evidence that a particular person committed said offense, described as followed: A BEIGE COLORED, TWO DRAWER FREE STANDING FILING CABINET WITH A LOCK ON THE BOTTOM DRAWER LOCATED IN THE WEST SIDE OF THE BUILDING IN AN EXAMINATION ROOM 1 DOOR TO THE SOUTH OF THE OFFICE MARKED DR. ZARNOW M.D.

"5.      Affiant has probable cause for said belief by reason of the following facts: ON THIS DATE OFFICERS RESPONDED TO DR. ZARNOW'S OFFICE LOCATED AT 1518 10TH STREET IN WICHITA FALLS, TEXAS. OFFICERS FOUND NUMEROUS EXPLOSIVES DEVICES INSIDE THE OFFICE. THE US ARMY BOMB SQUAD LOCATED AT FORT SILL, OKLAHOMA WAS CALLED TO THE SCENE. BOMB SQUAD PERSONEL ADVISED THAT THE DEVICES FOUND IN THE OFFICE WERE EXPLOSIVE. THE BOMB SQUAD CHECKED THE AREA INSIDE THE OFFICE AND LOCATED A LOCKED TWO DRAWER FILING CABINET IN AN EXAMINATION ROOM OF DR. ZARNOW'S. AFFIANT REQUESTS SEARCH WARRANT FOR THE LOCKED CABINET TO DETERMINE IF IT CONTAINS ANY TYPE OF EXPLOSIVE DEVICES THAT WOULD BE A DANGER TO PERSONS IN THE OFFICE. AN EMPLOYEE OF DR, ZARNOW MADE OFFICERS AWARE OF THE EXPLOSIVE DEVICES. THIS EMPLOYEE ALSO STATED THAT ZARNOW HAS TALKED TO HAVING VARIOUS TYPES OF OTHER EXPLOSIVE DEVICES IN HIS POSSESSION.

"WHEREFORE, your Affiant asks for the issuance of a warrant that will authorize him to search said suspected place and premises for said property and items and seize the same.

/s/ Bobby Dilbeck"

Page 20

"explosive devices" by the Ft. Sill EOD unit, it nowhere articulates facts from which it could be concluded that Dr. Zarnow had an "intent to combine the components into an explosive weapon for use in a criminal endeavor" or that the explosives devices constituted an "explosive weapon." Whether Dilbeck had been misinformed by Kendall or Keethler, or misunderstood the context in which the EOD unit used the terms "explosives" or misunderstood the distinction between mere possession of components versus possession with an intent to combine components in furtherance of a criminal enterprise, probable cause for the issuance of the office search warrant was not demonstrated. I find that Plaintiff has articulated facts to show that it was unreasonable for an officer with reasonable training to reasonably believe on the basis of information supplied to him and available to him at the time that Dr. Zarnow possessed the blasting caps, fuses and igniters with the requisite "intent to combine the components into an explosive weapon for use in a criminal endeavor." Absent such articulated facts, the search warrant affidavit on its face does not establish probable cause. It fails to identify the nature and character of the "explosive devices" to which it has reference and fails to establish how possession of such devices could constitute an offense. Office Dilbeck is not entitled to qualified immunity since Plaintiff has alleged and articulated facts sufficient to overcome the presumptive reasonableness of his actions.

These two slapdash affidavits apparently reviewed in a slapdash method by the magistrate did not establish probable cause for the continuation of the search at Dr. Zarnow's house after he effectively terminated his consent. Absent such probable cause the subsequent discovery of explosive materials, a machine gun and the subsequent wholesale seizure of firearms, weapons, ammunition, silver, currency and medications at Dr. Zarnow's house and lake house would be unreasonable within the parameters of the Fourth Amendment. Officers Kendall and Dilbeck are not entitled to qualified immunity.

## OFFICER DENNIS KEETHLER

Defendant Officer Dennis Keethler conducted a special videotaped interview of Dr. Zarnow's nurse, Brenda Kyle,  Keethler communicated certain information he obtained (or believed he obtained) during the course of that interview to Dets. Kendall and Dilbeck. There is an extensive dispute between Plaintiff's counsel and counsel for the Officers (including Keethler) as to the content of the videotaped interview, the language used, the statements made or not made. The accuracy of the transcription of the videotaped interview is in serious dispute. Both Kendall and Dilbeck in their own affidavits recite that they relied upon information supplied by Keethler incident to securing the issuance of the original home search warrant and the office search warrant. Whether Keethler was the source of erroneous or exaggerated information or whether his gleaned information was accurately reported and then distorted or exaggerated is an open question subject to a subsequent factual determination. Comparing the videotape transcript (as supplemented by the witness Kyle) to the affidavits in support of the original home and office warrants reflects some significant degree of exaggeration or hyperbole. Whether such exaggeration or hyperbole results from Keethler's exaggeration or hyperbole, it may have lead Kendall and Dilbeck astray. If so, he may have been the cause for the unreasonableness of the searches. Keethler is not entitled to qualified immunity.

## OFFICER BILL PURSLEY

Plaintiff's Amended Complaint names Defendant Bill Pursley, alleges that he resides within the territorial limits of the Wichita Falls Division of the Northern District of Texas and contains no other direct allegation of facts naming or identifying Pursley. Plaintiff's Summary Judgment Evidence reflects that Pursley arrived on the scene at Dr. Zarnow's house and was assigned the duty of logging the evidence seized. The alleged failure by Pursley to adequately log the evidence and maintain an adequate and complete inventory may have contributed to the failure of the department to return all of the items seized,

but such failures, if any, sound in negligence leading to the loss of property or its value, for which adequate remedy lies in a suit for a common law cause of action for conversion and/or negligent destruction of property.  Pursley is not implicated by Plaintiff in any of the Constitutional violations except perhaps the Fifth Amendment cause of action for destruction of private property without just compensation. Defendant Bill Pursley is entitled to qualified immunity with regard to Plaintiff's Second, Fourth, Fifth, Sixth & Fourteenth Amendment causes of action.  Plaintiff has heretofore abandoned his common law causes of action.  Therefore, Officers' Motion for Summary Judgment should be granted as to **Defendant Bill Pursley.**

## DEFENDANT MAJOR GERALD TODD

Plaintiff's Amended Complaint names Defendant Gerald Todd (erroneously Major Todd), but fails to articulate any facts or particularize allegations concerning Officer Todd beyond lumping him in as one of the supervisory officers at the home search scene.  Plaintiff's Summary Judgment Motion and allegations put Officer Todd at the home scene, implies he should have been one of the officers in charge, and inferentially ascribes to him responsibility for failing to properly supervise the investigation scene. Plaintiff's failure to articulate any involvement of Detective Todd beyond these general allegations are insufficient to establish any cause of action against him.  Officer Todd is not liable under vicarious liability or under *respondeat superior* liability by virtue of his supervisory position.  He is not implicated as a policy maker.  Defendant Gerald Todd is entitled to qualified immunity.  Plaintiff has failed to allege a cause of action against Officer Todd.  Therefore, Officers' Motion for Summary Judgment should be granted as to **Defendant Gerald Todd.**

## DEFENDANT JOHN CUMMINGS

Just as with Defendant Gerald Todd, Plaintiff has merely lumped Lieutenant John Cummings in as a supervisor at the house search scene.  Plaintiff's failure to articulate any involvement of Lieutenant

John Cummings beyond that general allegation are insufficient to state a cognizable cause of action against Him. Lieutenant John Cummings is entitled to qualified immunity. Therefore, Officers' Motion for Summary Judgment should be granted as to **Defendant John Cummings.**

### THE SEIZURES

In effecting the nine searches, in addition to firearms, ammunition and explosive components, law enforcement officers seized from Dr. Zarnow currency, gold coins, jewelry (including wedding bands), and medicines/drugs. None of such items were listed within the stated scope of the office search warrant or the home search warrant.[7] Defendants sought to justify the seizure of such items on the grounds that they were "in plain view" when seized at the various times during the searches. The seizure of said items being beyond the scope of the search warrant that was not even supported by probable cause were objectively unreasonable.

The officers who physically seized the firearms, weapons, ammunition and explosive materials from the office, house and lake place were not unreasonable in relying upon the existence of the warrants and under the supervision of their supervisors since they had no reason to question the warrants or to question the instructions of their supervisors. However, this did not legitimate the seizure of the currency, silver, gold coins, jewelry and medicines.

It does not exonerate the Chief of Police or the search policy of the City. Although under *Monell*[8] the City is not responsible in *respondeat superior* for the unwarranted actions of the police officers, the City may become liable if the unwarranted actions of the officers results from a policy or procedure. Plaintiff has alleged and submitted Summary Judgment Evidence to the effect that the City's search policy and instructions to its police officers effecting a search directed that they seize items "in plain

---

[7] Copies of the search warrants for Zarnow's house on July 16 and lake house on July 16 were not included anywhere in the summary judgment evidence

[8] *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)

view" whether or not the items may have any connection with any criminal activity. The allegations against the City articulated in the Amended Complaint and supported by Plaintiff's Summary Judgment Evidence are sufficient to raise a fact issue as to whether or not the City's official search policy, as articulated and interpreted by Chief Coughlin, and as followed by law enforcement officers in the field, directed or allowed officers to seize items "without any immediate apparent incriminating character." I find that there is a fact issue as to whether the "in plain view" search interpretation of the search policy of the City of Wichita Falls was the "moving force" for the officers' seizures of materials at Dr. Zarnow's home and lake house. Chief Coughlin's own deposition testimony implicated the overbroadness of the City's "in plain view" search policy:

> A: (Coughlin) ....  *But in preliminary investigating these things, that's probably one of the reasons you often will seize a lot initially until you rule things in or out. Anything that could possibly be evidence is – during the execution of the warrant it is – that's your opportunity at that point to collect whatever you believe to be evidence or potential evidence. It doesn't necessarily mean that every single piece will or will not be used at some point. It's just the opportunity to seize anything that could be connected to any kind of criminal activity.*

I find that there is a factual dispute as to the authority of the Chief of Police to establish policy for the City with regard to the manner in which members of the Dept. conduct searches and make seizures under search warrants or for materials "in plain view." I find that there is a factual issue as to whether the Chief of Police has adopted an over-expansive policy that allows officers to seize items as to which there is no perceived criminal connection. I find there is a fact issue as to whether the officers executing the search at Dr. Zarnow's house, in exercising the policy established by the Chief of Police for the City seized items beyond the scope of the home search warrant and having no connection to any criminal activity. In light of said fact questions, the City's Motion for Summary Judgment is DENIED.

## SECOND AMENDMENT VIOLATION

Plaintiff's Second Amendment argument proceeds from an extension of the Fifth Circuit holding

in *US v. Emerson*, 270 F.3d 206 (2001) as buttressed by the Firearms' Owners Protection Act[9] (hereinafter "FOPA"). In *Emerson*, the Fifth Circuit held that the Second Amendment does protect individual rights, not being limited only to a militia. In so holding, the Fifth Circuit further held that although the Second Amendment does protect individual rights "that does not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." (at p. 261)   As recently as 2004, District Judge Richard Shell addressed a Second Amendment claim by a defendant whose firearms were confiscated by police officers during a raid on his business.   In *Dickerson v. City of Denton*, 298 F.Supp.2d 567 (D.C., N.D.Tx 2004) Judge Shell, recognizing the Fifth Circuit's holding in *Emerson*, held with regard to Dickerson's Second Amendment claim that "so long as the requirements of the 'Fourth Amendment' are met, police officers may search a premises and confiscate guns that they believe have been used to commit a crime.   Such a search and seizure is a reasonable, necessary restriction on an individual's Second Amendment right to bear arms."   In so holding, Judge Shell held that Dickerson's Second Amendment claim was subsumed by his Fourth Amendment claim that the city officials lacked probable cause.   Following the Court's reasoning in *Dickerson*, I conclude that Dr. Zarnow's Second Amendment claim is subsumed in his Fourth Amendment claim.

Furthermore, *Emerson* was not decided until 2001, two years <u>after</u> the Zarnow searches/seizures. The contours of the right of an individual to bear arms, though broadly understood, was not then sufficiently clear that a reasonable officer would understand that what he was doing violated that right. (*Goodsa v. City of Corpus Christi*, 202 F.3d 720,736 (5th Cir. 2000).   I find that even under the Fourth Amendment analyses below Dr. Zarnow's Second Amendment claim must fail.

### SIXTH AMENDMENT CLAIM

Plaintiff claims he was denied right to counsel on two occasions:

1.    while he was being interrogated at the police station by Dilbeck and ATF Agent Smith, and

2.    when officers at his house refused to disclose to him that his attorney, Bob Estrada, had returned Dr. Zarnow's call.

---

[9]   Public Law No. 99-308,100 STAT. 449 (1986)

Under the holding by the Supreme Court in *Moran v. Burbine*, 475 U.S. 412, 89 L.Ed.2d 410, 106 S.Ct. 1135 (1986), Plaintiff's Sixth Amendment right is not implicated in either instance. Dr. Zarnow's comment during interrogation by Dilbeck and ATF Smith at the police station that "he would like to talk to an attorney or be told more specifically what was going on" was conditional. After he was taken back home following the interview he did not again request counsel. The police's culpability in failing to inform respondent (here, Zarnow) of a telephone call (from his attorney) has no bearing on the validity of Dr. Zarnow's implied waiver of the presence of counsel. Neither at the time he was escorted to the police station for an interview nor at the time that he had returned home following the interview was Dr. Zarnow under arrest or had any charges then pending against him. The Sixth Amendment right to counsel had not accrued. Failure to inform him of the attorney's return call was not a denial of a Constitutional right.

## FOURTEENTH AMENDMENT
## DENIAL OF MEDICAL CARE

The Summary Judgment Evidence of Plaintiff and Defendants nowhere indicates that Dr. Zarnow cried out for or requested food or medications. Plaintiff alleges that Dr. Zarnow's medical condition and failing stamina were apparent and observed by the officers. The officers' own affidavits submitted with the Motion for Summary Judgment reflect that their observations of Dr. Zarnow gave no indication he needed medical care or food or hydration. In the absence of a request for food or an apparent medical condition requiring immediate treatment/medication, no Constitutional right is implicated. Plaintiff having to abandon any common law cause of action, Defendant Officers' Motion for Summary Judgment with regard to Plaintiff's cause of action for denial of medicare care is **GRANTED**.

## FOURTEENTH AMENDMENT
## GENERAL

Apart from the Fourth Amendment cause of action discussed at length above, Plaintiff has articulated no independent Fourteenth Amendment cause of action against any of the defendants.

## O R D E R

In summary, Plaintiff's Motion for Summary Judgment is **DENIED**.

Defendant Officers' Rule 12 Motion to Dismiss is **GRANTED** as to:

1.   John Doe Officers Nos. 1 through 4
2.   John Doe Officers Nos. 5 through 8

3.   Officers Gerald Todd
4.   Officer Jay Cummings
5.   Officer Bill Pursley.

Defendant City of Wichita Falls' Motions to Dismiss and for Summary Judgment are **DENIED**.

Defendant Officers' Motions for Summary Judgment are **GRANTED** with respect to Plaintiff's causes of action stated under the Second, Fifth, Sixth and Fourteenth Amendments.

Defendant Officers' Motions for Summary Judgment with respect to Plaintiff's causes of action under the Fourth Amendment (applicable to the State under the Fourteenth Amendment) against Defendants Roger Kendall, Bobby Dilbeck, Dennis Keethler and Chief Ken Coughlin are **DENIED**.

**SO ORDERED**, this 12th day of May, 2006.

**ROBERT K. ROACH**
**UNITED STATES MAGISTRATE JUDGE**