IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| DR. ALLEN J. ZARNOW § | |
| § | No. 7:01-CV-128-KA |
| V. § | ECF |
| § | Referred to the US Magistrate Judge |
| CITY OF WICHITA FALLS, ET AL. § | |

**Memorandum and Order on Motions for Summary Judgment**

Before the Court are Plaintiff's Motion for Partial Summary Judgment (Docket No. 169) and Defendants' Motion for Summary Judgment (Docket Nos. 171). Extensive responses and replies with extensive appendices have been submitted by the parties. The parties have consented to trial before the Magistrate Judge. (Docket No. 38).

This is a civil rights case originally brought under title 18 U. S. Code §1983 by Dr. Allen Zarnow, now deceased, for compensatory and punitive damages for an unreasonable search and of his house and office by police officers of the City of Wichita Falls and their unreasonable seizure of items of his personal property during the search. Dr. Zarnow sued a number of the officers who obtained warrants for the search of his house and his office, the Chief of Police and the City itself. The City, the Chief of Police and the individual officers appealed this court's denial of qualified immunity. During the pendency of this case, Dr. Zarnow died. Following his death during the pendency of this case, his wife, Delores A. Zarnow, as the executor of his estate, was substituted as the Plaintiff.

On an intermediate appeal, the Court of Appeals determined that the search conducted at Dr. Zarnow's house was unconstitutional due to the lack of probable cause for the issuance of the warrant, but that the individual officers who conducted the search had qualified immunity. The Court of Appeals dismissed the appeal by the City and the Chief of Police for want of jurisdiction. Following issuance of the 5th Circuit's mandate, this court entered an order (Docket No. 163) dismissing Police Chief Kenneth Coughlin as an *individual* party defendant, leaving the City and Coughlin in his *official capacity* as the only remaining defendants.

The factual background of the search and seizure events that gave rise to this suit is set forth at length in the 5th Circuit's decision [1] on the appeal of the qualified immunity issues in this case and will not be repeated here.

Since the time of the Original Complaint and following the intermediate appeal, Plaintiff's claims have been scaled down dramatically. At the inception, Plaintiff sought

---

[1] *City of Wichita Falls et al v. Zarnow*, 500 F.3d 401 (5th Circuit 2006).

personal injury damages as well as pecuniary compensation for the embarrassment and effrontery and loss of employment Dr. Zarnow sustained as a result of the illegal searches of his office, home and lake house by swarms of law enforcement officers and the seizure and public display of his legally purchased and stored firearms, ammunition and personal property items and the eventual loss and destruction of some of these items.  Now, it is only the pecuniary value of the loss of the ammunition and the value of the few items of Zarnow's personal property that were not returned by the City that supports his property damage claims, but the personal injury claims are still within the scope of the pleadings.  This scale down has occurred in part as a result of the dismissal of claims against the individual officers on qualified immunity grounds leaving punitive damages unrecoverable against the City and/or the Chief of Police, the sole remaining defendants and in part because the seized firearms were previously returned to Zarnow and the seized ammunition was destroyed pursuant to an agreement reached between Zarnow and the office of the District Attorney of Wichita County, Texas.  The decision of the Court of Appeals further precluded a finding that the seizure of the firearms, explosives and components at Zarnow's Office was unreasonable since seizure of those items were expressly directed in the Zarnow search warrants.[2]  All that is left of the subject matter of Plaintiff's damage claims is the seizure of the currency, prescription drugs, gold and silver bars, and guns at his home.

In summary, by her Motion for Partial Summary Judgment, Plaintiff asserts that at the time of the Zarnow search, as to search and seizure matters within his purview, Chief Coughlin was a *final policy maker*.  As such *final policy maker* he had established a binding, unreviewed, unwritten *policy* arising from a *custom* of allowing police officers during a search to seize indiscriminately any items of personal property in "plain view" that *might* be evidence of or fruits of *some* crime.  Plaintiff says that the *policy* allowed officers to seize the items whether or not the officer seizing the property could then or later identify or articulate the crime as to which the seized items were evidence or fruits.  Further, since the search warrant for Zarnow's home was not valid due to the absence of probable cause, the search made after consent was withdrawn by Zarnow was a violation of Zarnow's Constitutional rights.[3]  And further the seizure of items not even mentioned within the four corners of the warrant itself (currency, prescription drugs, and silver) was unreasonable and caused the damages to Zarnow.  Plaintiff asserts that it was the unreasonable, illegal expansion of the "plain view" doctrine of the Chief's *policy* that was the

---

[2] The warrant seizure scope read as follows: "VARIOUS TYPE OF EXPLOSIVES, ASSORTED EXPLOSIVE TRIGGERING DEVICES, ANY PROHIBITED WEAPONS, WRITTEN RECORDS, BOOKS, NOTES AND DOCUMENTS INDICATING THE SALES PURCHASES AND/OR TRANSACTIONS OF EXPLOSIVE DEVICES. ANY PAPERS OR DOCUMENTS INDICATING THE TRANSPORTARTION [sic]OF AND/OR PURCHASE OF PROHIBITED WEAPONS. WRITTEN DOCUMENTS INDICATING POSSESSION OF AND/OR DOMINION AND CONTROL OF THE HERE AND AFTER DESCRIBED PREMISES, SUCH AS UTILITY BUILDINGS, RECEIPTS, MAIL ETC. WRITTEN DOCUMENTS INDICATING POSSESSION OF OR OWNERSHIP OF ANY OTHER PROPERTIES, COMPUTERS AND ANY AND ALL CONTENTS INCLUDING ALL FILES. ANY PAPERS OR DOCUMENTS INDICATING THE LEASE OF STORAGE FACILITIES OF ANY TYPE."

[3] So found by the District Court and the Court of Appeals, *Zarnow* case, supra p. 409.

moving force behind the seizure of the unmentioned items and their eventual loss resulting in Plaintiff's pecuniary and personal injury damages. Finally, even if Coughlin was not a "final policy maker", there was a *custom* among the members of the Department to indiscriminately seize property ostensibly "in plain view" but without being related to the crime or crimes being investigated for which the items were seized. "And", says the Plaintiff, "the City knew about the *custom* and was consciously indifferent to it.

In summary, the City asserts that under state and local law, Chief Coughlin was not a policy maker, much less a *final* policy maker. Only the City Council and through it the City Manager were permitted under Texas state law and the City's own charter to make policy binding on the City; that the City had adopted as its search and seizure policy the standards set out in Article 18.01 of the Texas Code of Criminal Procedure which was in effect at the time of the Zarnow search (state law) ; that the City Council had never expressly delegated to the Chief of Police the authority to nor did he establish any formal or by custom any informal search and seizure *policy*, much less a "plain view" policy, much less an unreasonably broad "plain view" policy; that the items seized during the Zarnow search were in "plain view"and the officers seizing the items reasonably thought at the time that the items were evidence or fruits of a crime or crimes. Hence, says the City, the seizure of the items was not unreasonable and hence, not a constitutional violation and, besides, and besides the City was unaware of the expansive "plain view"*custom*, if it existed, and was not consciously indifferent to it. Finally, under *Monell*[4] and its progeny, something more than negligence was required for the City to be liable to Zarnow for the loss or non-return of the seized items. And Zarnow has no evidence to show any personal injury damages and the loss of the other items was *de minimus* at best.

With respect to municipal liability for constitutional violations by its employees, Judge Kinkeade observed in a recent §1983 case[5] the following:

> "Although municipal liability exists under 42 U.S.C. § 1983, there is no *respondeat superior* liability for a constitutional deprivation by its employees. *Bd. Of County Commr's of Bryan County, OK v. Brown*, 503 U. S. 397, 403 (1997); *Pineda v. City of Houston*, 291 F. 3d 325, 328 (5th Cir. 2002); citing *Madrid v. Anthony*, ___F. Supp.2d ___, 2007 WL 2782360 *4 n.16 (S.D..Tex. 2007) (municipality cannot be held liable under section 1983 because it employs a tortfeasor under a *respondeat superior* theory). Rather, the city's liability under section 1983 depends on proof of three elements: a policymaker, an official policy, and a violation of the plaintiff's constitutional rights whose "moving force" is the policy or custom. *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (55th Cir.), cert. Denied, 534 U.S. 820, 122 S.Ct. 53, 151 L.Ed 2d 23 (2001)."

---

[4]

[5] *Reed v. City of Garland*, Civil Action No 3:04-CV-239-K (N.D. Tex. 2007)

. . .
> "Municipal policy for the purposes of section 1983 liability may be found in a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. *Johnson v. Deep East Texas Regional Narcotics Trafficking Task force*, 379 F.3d 293, 309 (5th Cir. 2004), citing *Johnson v. Moore*, 958 F.2d 92,94 (5th Cir. 1992). Alternatively, municipal policy under section 1983 can be a persistent, widespread practice of municipal officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *Id.* Actual or constructive knowledge of such a custom must be attributed to the governing body or the municipality or to an official to whom that body had delegated policy-making authority." Pp.2-3.

With respect to determining who within a municipality has "final policy making authority" the Supreme Court has directed the courts to look to state and local law[6] but has evinced no preference for any single body as the source of municipal policymaking. The Supreme Court has instead remarked that "one may expect to find a rich variety of ways in which the power of local government is distributed among a host of different officials and official bodies. *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999). The identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge. "Reviewing the relevant legal materials, including state and local positive law, as well as '"custom or usage"' having the force of law" *St. Louis v. Praprotnik*, 485 U. S. 112, 108 S. Ct. 915, 99 L. Ed.2d 107 (1988).

To convince the court that Chief Coughlin was not a final policy maker the Defendants present to the court that the City of Wichita Falls is a home rule city which derives its powers from the Texas Constitution and whose broad powers are limited only by the City Charter, the Texas Constitution or by State statute, citing section 5 of Article 11 of the Texas Constitution and Section 51.072 of the Texas Local Government Code. Further, the City Charter [7] expressly provides that "the city council shall set policy for the City by the enactment of ordinances, the passage of resolutions, the adoption of a budget and the passage of such other rules as necessary to establish city policy under the laws and Constitution of the State of Texas."[8] The City Charter further provides that the City Manager is delegated the authority to prescribe operational rules

---

[6] *Jett v. Dallas Ind. School District*, 109 S.Ct. 2702, 491 U.S. 701, 105 L.Ed. 2d 598 (1989).

[7] App. pp. 1-105, Docket No. 171

[8] App. p.81, Docket No.171

4

and regulations to effectuate that policy[9] and reserves to the City Manager the right to supervise the Department Heads[10] such as the Chief of Police established by Ordinance 998 in 1927.[11] Elsewhere in the Charter, as amplified by subsequent ordinances, the City Manager had the power to appoint and to hire and fire the Chief of Police. The general authority of the Chief of Police was proscribed and constrained as follows:

> "The Police Department shall be under the direction of a Chief of Police, who shall be appointed by the City Manager and who, subject to the supervision of the City Manager and to such rules, regulations and orders prescribed by the City Manager not inconsistent with the charter and ordinances of the City, shall have immediate control and direction of such Department. He shall be vested with the disciplinary power of the Department. Such Department shall be composed of the Chief of Police, a night captain, sergeant, detectives, patrolmen, and other officers and employees as the City Manager may determine."[12]

On paper, there is no express delegation of authority to the Chief of Police to promulgate policy, much less any *final* policy. But the Plaintiff notes that the Charter and Ordinances of the City do not expressly <u>negate</u> the authority of the Chief of Police to create and/or promulgate policy for his Department with respect to matters of Department concern, so long as those policies do not conflict with policies of the City Manager or the City Council.

Where the State and local positive law does not expressly answer where and under what circumstances the Chief of Police may make final policy, we must look at actual practice within the Department and the City. Plaintiff is unable to point to any *express* delegation of authority to Chief Coughlin to create any policies binding on the City but instead relies on an alleged *custom and usage* established under Coughlin's predecessor in office. The former Chief promulgated at least two "General Orders" relating to aspects of law enforcement within the Department that remained unchanged by the City Manager or the City Council and still remained in force or effect at the time of the Zarnow searches. The first of these General Orders (Exhibit 3, Docket No.169) was numbered 200.003, dated March 27, 1987 with an effective date of September 15, 1987, titled *Preliminary and Followup Investigations by Patrol Officers, Command of the Crime Scene, Media Relations at a Crime Scene*. In the first Section of the General Order it is stated:

> "A. <u>It is the policy of this department</u> for Patrol Section Officers to respond to all complaint calls and conduct preliminary investigations...." (emphasis provided).

Throughout this General Order the provisions used the imperative words "shall" or "will"

---

[9] App. p. 29, Docket No. 171

[10] App. p. 105, Docket No. 171

[11] App. pp.151, Docket No. 171

[12] App. pp.151-52, Docket No. 171

5

as directives toward the officers conduct in the various aspects of law enforcement investigation activities referenced therein. The General Order bears the signature of the then acting Chief of Police.

The second of these General Orders (Exhibit 2, Docket No. 169) was numbered 100.035, dated March 15, 1987 with an effective date of June 1, 1987, titled *Property, Reception and Storage of Property, Disposition of Department-Owned Property, Narcotics and Dangerous Drugs, Reception and Storage, and Disposition of.* In the First section of this General Order it is stated:
> "A. <u>It is the policy of this Department</u> that all items of an evidentiary nature, found or recovered property, contraband, and department stores be entered into the property room..." (emphasis provided)

And, as with the previously mentioned General Order, this one too used the imperative words "shall" and "will" throughout its provisions. This General Order also bears the signature of the then acting Chief of Police.

I find that these General Orders clearly established "policy" within the Department binding upon the officers within the Department with respect to the discharge and manner of discharge of certain of their law enforcement duties. These policies were *final* policies until reviewed, altered, changed or amended by the City Manager an/or the City Council as was their unexercised right, power and prerogative. The policies evidenced by and incorporated in the General Orders were clearly promulgated by the then acting Chief of Police and they remained unchanged or repealed and perhaps even unreviewed by the City Council or the City Manager. And until reviewed, altered, amended or repealed, they had the force of law within the Police Department of the City. Their promulgation and adoption by the Chief of Police evidence the establishment of a custom for the Chief of Police of the City of Wichita Falls to formulate and propagate formal policies binding within the Police Department touching upon areas of law enforcement activities. While this custom of allowing the Chief of Police to formulate or establish policy within the Department was not an *express* delegation of final policy-making authority to the Chief of Policy, it was at least an *informal* delegation of such final policy-making authority and gave the Chief *implied authority* to formulate and enforce policy. Therefor, I conclude that with respect to law enforcement activities of officers within the Police Department of the City of Wichita Falls at the time of the Zarnow searches, Chief Kenneth Coughlin was a *potential* final policy maker.

The issue then is whether Chief Coughlin actually created or established any policy (*formal* or *informal*) that was the moving force behind the constitutional violations. Plaintiff cannot point to any formal policy such as a General Order promulgated by the Coughlin with respect to the scope and manner of seizures of property during a search. Rather than a *formal* policy, Plaintiff claims that Coughlin as a final policy maker condoned or allowed officers to seize items beyond the scope of the express language of a search warrant under an impermissibly broad "plain view" theory, thereby creating policy by *custom or usage having the force of law*. Citing the 5th Circuit's language in *Gros, supra,* in support of this proposition, Plaintiff presents

6

excerpts from the depositions of several of the officers who participated in the search at Zarnow's house and excerpts from Chief Coughlin's own deposition.

Officer Dilbeck who participated in the house search testified on his deposition that he was familiar with the "plain view" doctrine by which "If an officer observes something in plain view that is an obvious violation or something, you know, that's against the law, an officer has the right to seize that object or whatever." To explain the justification for seizing Dr. Zarnow's currency that he kept at his home, Dilbeck opined, "Well, that's an unexplained wealth and large amounts of cash sometimes are fruits of crime, some other crime, and with the fact that there were numerous drug items around, all kinds of drugs throughout the house, there is a possibility that this man might be selling dope, being a doctor or not. So money could be money derived from sale of drugs or from the sale of weapons, so at this point it was just the beginning of our investigation, we took the money, you know, like I say, it's something that can be returned later...So that could be the justification for seizing all the money throughout this."

Again after being asked about the seizure of gold coins, Canadian gold sets, and a block of silver, Dilbeck says "We don't know what all crimes Dr. Zarnow has committed or might have committed. So it's just based on further investigation. We may determine later that he's selling drugs and therefore a lot of this stuff would have been seized.

When further examined as to the justification for seizing every gun in the house, Dilbeck explained that one of the officers involved in the search "contacted the district attorney's office and advised them of just of all the things that were at the house and was advised by Jerry Taylor, I believe it was, from the DA's office to go ahead and take all of the items at that time, all of the weapons and items we thought might be explosive devices at that time."

Explaining the justification of seizing sports model shotguns, Dilbeck testified "Shotguns? Well, they could be prohibited, you know, more investigation could be required to determine if they were or not. You know, checking the serial numbers to make sure they were not stolen. Just the mass quantity of them there is no way we could do that at the scene at that time at night. Lots of reasons could make a shotgun a prohibited weapon, but just a shotgun in and of itself is not generally a prohibited weapon...Like I say, we took all the weapons based on what the DA's office told us and again we are in the beginning stages of our investigation...My answer is going to be the same for every gun you're going to ask about, so we could cut this a lot shorter."

The second officer to be deposed, Officer Kendall, who also participated in the search of Dr. Zarnow's home, explained the "plain view" doctrine in this manner:
> "If a peace officer is in a place that he has a legal right to be, and he observes something that he thinks is contraband or violates a law or is a piece of evidence, then he doesn't need a search warrant to seize the item. That's a basic, condensed form of what that says."

He goes on to testify that he is not aware of any requirement that an officer contemporaneously document his reasoning or articulate his justification for seizing an item saying:

7

"I don't think it's spelled out anywhere that I know of. As far as plain view and why and item is seized or the reason, I'm not aware of any place where it's spelled out that they document their reasoning."

As to the justification for seizing the currency, Kendall opined;

"This item along with the other currency that was seized early in our investigation. The currency could have been to be used for purchase explosive weapons or devices or prohibited weapons or it could have been from the sale of explosive weapons, prohibited weapons, or even controlled substances or dangerous drugs. So it was taken into custody at this time pending further investigation."

As to justification for seizing the sports model shotguns, Kindall stated;

"The sheer volume of weapons that he had at his residence, it was not feasible to check all these weapons individually and to see about the legality of possession of them. Often weapons can be converted for other purposes such as launching explosives or converted to full automatic. These often have to be checked by a qualified person or and at a gun range where it's safe to do so."

Chief Coughlin in his deposition testimony confirmed his familiarity with the "plain view" doctrine which he summarized:

"Well, basically, if in the course or scope of an officer's duties they come across something that's sitting out in the open that would not–you know, would be obviously, say, something of a contraband nature or of an evidentiary nature or something of a particular crime, that's generally accepted that you don't—you can look at it and seize it if it's something that's there in plain view. "They would have to legally be where they would–where they are for a legal reason...."

As to justification for the seizure of an item, Coughlin's deposition testimony went as follows:

Q. Does the reasoning for seizing the item need to be immediately apparent?
A. Not necessarily."
Q. If an item is seized under the plain view doctrine, what would be the process for documenting the officer's reason in seizing it?
A. Usually through the course of the investigation that would be included in some—some type of form during that investigation as to what the–what the reason
of what they seized was for.
Q. What type of form?
A. Well, I say in some form. I mean...
Q. Okay.
A. –probably generally in–somewhere written in the narrative or some description or something along that lines.
Q. But you do require that they describe their reasoning in seizing that item when they did?
A. I wouldn't say that we require it."

Based upon these testimonial statements in the depositions of Chief Coughlin and Officers Dilbeck and Kendall, Plaintiff argues that an overly expansive "plain view" seizure policy had been established by *custom and usage* within the Wichita Falls police department, which policy had the force of law. Such a policy was impermissibly broad argues the Plaintiff,

because it violated the more rigid standards articulated by the United States Supreme Court in *Arizona v. Hicks*, 480 U. S. 321, 107 S. Ct, 1149, 94 L. Ed. 2d 347 (1987) and its progeny. Under *Hicks*, *probable cause* is required to invoke the "plain view" doctrine as it applies to seizures.

I find that Coughlin's, Dilbeck's and Kendall's deposition testimony reflected that those officers believed and acted upon an interpretation of the "plain view" doctrine that did not require that the officer seizing items outside the scope of an issued search warrant to have "probable cause" to believe that the item was a evidence of, or fruits of, or instruments of, or constituted a crime but could instead rely solely upon a "suspicion." The warrant for the search of Dr. Zarnow's home was not supported by probable cause.[13] The scope of the items ostensibly authorized under the warrant to be seized were weapons and explosive devices, not currency, drugs, coinage, gold or silver. If the officer's had a right to be where they were because they were not aware of the deficiencies in the warrant under which they were conducting the search and had the right to see what they saw, they did not have the right to seize items that they did not have *probable cause* to believe were the forbidden items, forbidden fruit, of evidence to forbidden activities. There was no exhibition of "exigent circumstances" to proceed with the seizure of these items without first articulating probable cause to a detached magistrate to support the issuance of a warrant. There has been no showing of "special operational necessities" for the seizure to proceed without a warrant.

Post-seizure speculation several years after the seizures as to what an officer might have thought at the time of seizure is insufficient to support a seizure of items outside the scope of a warrant, whether the warrant was or was not supported by probable cause and whether or not the officers knew the warrant lacked probable cause or not. This deficiency applies not only to the currency, the coinage, the silver block, and the drugs (prescription or not) but also the guns (like the shotguns) that were not clearly altered or modified in some way as to convert them into prohibited weapons. I conclude that the seizure of these items was an unconstitutional unreasonable seizure.

But this conclusion does not determine the issues before the court as I do find that Plaintiff has failed to present any evidence that these officer's interpretations of the scope and parameters of the "plain view" amounted to a policy of the police department or of the City of Wichita Falls. A mere common misunderstanding of the permissible scope of the "plain view" doctrine does not convert that shared misunderstanding into "policy" for which a municipality may be held liable. This misunderstanding evidenced by the deposition testimony of these officers does no rise to the "force of law." Plaintiff has not demonstrated that there were any other occurrences within the community where this misunderstanding of the "plain view" doctrine led to an impermissible seizure. Nowhere is there proof that this misunderstanding is wide spread or that seizures under this interpretation are well accepted. Proof of random acts or isolated incidents is not sufficient to show the existence of a custom or policy. Isolated violations are not the persistent, often repeated constant violations that constitute custom or policy as required for municipal § 1983 liability. *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995). There is no showing that this misinterpretation was general or widespread

---

[13] *Zarnow*, supra note1, *at page 409.*

throughout the police force. *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir.), cert. denied, 506 U.S. 973, 113 S.Ct. 462 (1992). That the chief of police himself was under the same misunderstanding did not make it the policy for his department. Negligence or stupidity alone does not make the City liable.

As regrettable as the unconstitutional invasion of Dr. Zarnow's home and the seizure of Dr. Zarnow's shotguns, currency, coinage, gold, silver, and drugs were, it was not actionable. Plaintiff's Motion for Partial Summary Judgment is denied. Defendants' Motion for Summary Judgment is granted.

So ORDERED this 25th day of February, 2009.

*Robert K. Roach*
**UNITED STATES MAGISTRATE JUDGE**